In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-14-00482-CV**
_____

**GEORGE E. RHYMES JR. AND RHYMES INDUSTRIAL FILTRATION & CONSULTING, L.L.C., Appellants**

**V.**

**FILTER RESOURCES, INC., Appellee**

**On Appeal from the 136th District Court**
**Jefferson County, Texas**
**Trial Cause No. D-194,154**

**MEMORANDUM OPINION ON REHEARING**

On appellants' motion for rehearing, we withdrew our opinion of April 14, 2016, and we substitute this opinion in its place.

Filter Resources, Inc. ("Filter") sued George E. Rhymes Jr. ("Rhymes") and Rhymes Industrial Filtration & Consulting, L.L.C. ("Industrial") for breach of contract, breach of fiduciary duty, and tortious interference. A jury found in favor of Filter. In eight appellate issues, Rhymes challenges the jury's verdict, the

1

admission of evidence, and the injunctive relief award. Filter presents two cross-issues regarding damages and attorney's fees.[1]

## Factual Background

According to the record, Rhymes first became employed with Filter in 1998. James Metcalf Jr., Filter's chief executive officer and president, testified that Rhymes was a branch manager and salesman for Filter. There was testimony that Rhymes had access to confidential information, such as products, prices, contracts, and financial, vendor, and customer information. In 2000, Filter asked Rhymes to sign a contract that contained the following clause:

> The Employee shall not for a period of one year immediately following the termination of his employment with the Employer, either directly or indirectly:
>
> 1. Make known to any person, firm, or corporation the names and addresses of any of the customers of the Employer or any other information pertaining to them; or
>
> 2. Call on, solicit, or take away, or attempt to call on, solicit, or take away any of the customers of the Employer on whom the Employee called or with whom he became acquainted during his employment with the Employer, whether for himself or for any other person, firm, or corporation.

---

[1]We group Rhymes's complaints into eight issues.

2

The contract also stated:

> The Employee during the term of employment under this agreement will have access to and become familiar with various trade secrets, consisting of formulas, patterns, devises, secret inventions, processes, and compliance [sic] of information, records, and specifications, customer lists, vendor lists, marketing strategies, pricing strategies, financial information, and specifications, which are owned by the Employer and which are regularly used in the operation of the business of the Employer. The Employee shall not disclose any of the aforesaid trade secrets, directly or indirectly, nor use them in any way, either during the term of this agreement or at any time thereafter, except as required in the course of his employment. All files, records, documents, drawings, specification, [sic] equipment and similar items relating to the business of the Employer, whether prepared by the Employee or otherwise coming into his possession, shall remain the exclusive property of the Employer and shall not be removed from the premises of the Employer under any circumstances whatsoever without the prior written consent of the Employer.

Rhymes testified that he did not want to sign the contract. According to Rhymes, his boss stated that it was just paperwork and not to worry; thus, Rhymes believed he was not bound by the contract. Rhymes admitted knowing that he might be sued if he competed with Filter.

Franklin Bridges, Filter's vice-president, managed the sales area Rhymes worked in. Bridges testified that Rhymes told him he planned to leave Filter to go into a different business. Rhymes's last day of work with Filter was August 17, 2012, but Rhymes remained on Filter's payroll through the end of

3

August. Bridges testified that Rhymes's Industrial business card listed the same cell phone number that he used while employed with Filter. Cheryl Rhymes, Rhymes's wife, testified that this was Rhymes's personal phone that he also used for business and that she paid Rhymes's phone bill, which Filter reimbursed. Rhymes testified that Filter paid his phone bill and that he still uses the same phone number, but that he had the phone number before his employment with Filter. Bridges admitted that Rhymes brought the phone number and a cell phone with him when he began working for Filter. He testified that Filter subsequently paid for Rhymes's new cell phone and the cell phone bill.

Metcalf testified that Rhymes also used a planner to record business information but that Filter owned the information Rhymes recorded in the planner. Rhymes admitted taking his planner and some business cards when he left Filter, but he claimed to have had the planner before he went to work for Filter. Metcalf opined that Rhymes should not have taken the planner when he left Filter because the planner contained information that belonged to Filter.

Bridges testified that, within six weeks of leaving Filter, Rhymes was selling to five of Filter's customers. He and Metcalf testified that Rhymes's customers were all Filter customers. Cheryl testified that Industrial sells the same products as Filter and is a competitor of Filter. She was unaware that Industrial

4

had any customers outside of those Rhymes served during his employment with Filter, but she claimed that each of those customers first contacted Rhymes. Rhymes also admitted that Industrial is in direct competition with Filter, that all of his customers are former Filter customers, and that Industrial sells almost all the same products as Filter. He further admitted to calling on, soliciting, and selling products to Filter's customers. Rhymes explained that he did not believe he had violated the non-compete agreement because Filter's customers contacted him first.

Joshua Crookshank, an area manager for Filter, testified that before Rhymes left Filter, Rhymes took Crookshank to meet some of Filter's customers and Rhymes told the customers he was starting his own business. Alan Clarke testified that he is the president of Jonell, a company that manufactures filter elements. Rhymes told Clarke that he intended to go into the distribution business with a concentration on the natural gas market, which Clarke believed to be different from Filter's business. Rhymes told Clarke that he chose a different market because he had a non-compete agreement with Filter. At some point, Clarke became aware that Rhymes was ordering parts from Jonell on behalf of some of Filter's customers. Rhymes told Clarke that he spoke with an attorney and that the non- solicitation clause was not worth a "s---."

5

Harold Doucet, Filter's account manager, testified that Filter has a consignment agreement with Total Refining and that he learned of Rhymes's attempts to circumvent that agreement. He explained that a part Filter provides to Total, through the consignment agreement, had not been replenished by Filter but had been replaced by Rhymes. He also testified that he saw Rhymes's business card on the desk of another one of Filter's customers.

According to Metcalf and Bridges, after Rhymes left, Filter's sales decreased by over a million dollars. Doucet testified that sales declined monthly and he could not recoup all the lost sales. Clarke testified that Filter does more business with Jonell than Rhymes but that Jonell's sales to Filter were "continually sliding[.]" Jeffrey Compton, a certified public accountant, testified that Filter's lost profits total $622,800.

The jury found that: (1) Rhymes failed to comply with the non-solicitation clause, the confidentiality and non-disclosure provisions, and his duties "not to compete with Filter Resources by establishing his own new, competing business, while still employed at Filter Resources[,]" "not to misuse Filter Resources' materials and resources to establish his own new, competing business, while still employed at Filter Resources[,]" and "to refrain from using Filter Resources' confidential and proprietary information, disclosed during employment with

Filter Resources;" (2) appellants intentionally interfered with Filter's prospective contractual or business relations; (3) appellants did not have a good faith belief that their conduct was not prohibited by the employment contract; (4) Filter was entitled to $620,000 in damages; (5) the harm caused to Filter resulted from malice; (6) Filter was entitled to $0 in exemplary damages; and (7) Filter was entitled to $125,000 in attorney's fees. The trial court granted Rhymes's motion for judgment notwithstanding the verdict regarding attorney's fees, disregarded the jury's answer to question seven in light of the zero award for exemplary damages, conditionally granted injunctive relief requiring Rhymes to return the cell phone and SIM card, and denied additional injunctive relief.

## Legal Sufficiency

In issues one through six, Rhymes challenges the legal sufficiency of the evidence to support the jury's verdict. Under a legal sufficiency review, we consider whether the evidence "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the verdict, credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010).

7

Rhymes's first, second, and third issues challenge the jury's findings that he breached the contract's non-solicitation provision, violated the contract's confidentiality and non-disclosure provisions, and breached his fiduciary duties. The one-year non-solicitation clause prohibited Rhymes from directly or indirectly calling on, soliciting, or taking away, or attempting to call on, solicit, or take away any of Filter's customers on whom Rhymes had called or with whom he became acquainted during his employment with Filter. Additional provisions prohibited Rhymes from (1) making known to any person, firm, or corporation the names and addresses of Filter's customers or any other information pertaining to those customers; and (2) directly or indirectly disclosing or using any trade secrets during or after his employment.

An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed, and the employee has no general duty to disclose his plans to his employer. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201 (Tex. 2002). An employee may not appropriate his employer's trade secrets, solicit his employer's customers during his employment, carry away employer information, such as customer lists, or act for his future interests at his employer's expense by using the

8

employer's funds or employees for personal gain or by a course of conduct designed to hurt the employer. *Id*. at 202.

In this case, the jury heard evidence that, before leaving Filter, Rhymes incorporated Industrial and contacted Kim Jackson at RBF, one of Filter's customers, to obtain a new vendor form. Rhymes told Jackson that he was thinking of leaving Filter and asked Jackson about the procedures for getting set up as a vendor. Rhymes also spoke with Jerry James at Koch Pipeline, another Filter customer, and provided James with Industrial's information. Rhymes testified that James called him for the purpose of helping him get set up with Koch. Rhymes's telephone records indicate that, while still on Filter's payroll, he initiated calls to some of Filter's customers.

The jury heard Cheryl and Rhymes testify that Industrial made sales to Filter's customers only after those customers first contacted Rhymes. Rhymes admitted that Industrial is a competitor of Filter, Industrial sells almost all the same products as Filter, and that he called on, solicited, and sold products to Filter's customers. Additionally, the record demonstrates that Industrial made sales to five of Filter's customers within the first six weeks of Rhymes leaving Filter and that within the first year of business, all of Industrial's customers were former Filter customers. Rhymes visited BASF, a Filter customer, on numerous

9

occasions, filed a vendor application with BASF, took BASF employees shooting and hunting, and discussed BASF filters with Jonell before making a sale to BASF. The jury also heard Doucet testify that Rhymes circumvented a consignment agreement between Filter and Total.

Moreover, the jury heard Metcalf and Bridges testify that Rhymes had access to confidential information. Rhymes testified that he protected Filter's financial information during his employment and did not use it for his own purposes. He denied using any of Filter's pricing information. The jury heard Rhymes testify that, despite his access to Filter's pricing information and his disclaiming use of such information, he represented to his insurance company that Industrial's projected annual sales would be at least $750,000. Although Rhymes denied formulating this number based on sales to Filter's customers, the jury heard evidence that Industrial generated annual sales of $732,914.80.

As sole judge of the weight and credibility of the evidence, the jury was entitled to decide which evidence to believe and, therefore, could reasonably conclude that Rhymes violated the non-solicitation clause by directly or indirectly calling on, soliciting, or taking away Filter's customers on whom Rhymes had either called or had become acquainted with during his employment. *See Wilson*, 168 S.W.3d at 819. The jury was entitled to reject

10

Rhymes's testimony that he did not use Filter's confidential information, such as customer information and pricing lists, to further Industrial's business. *See id*. In doing so, the jury could reasonably conclude that Rhymes breached the contract's confidentiality and non-disclosure provisions. *See id*. Additionally, the jury was asked if Rhymes violated *any* of the following fiduciary duties, to which the jury answered "yes:"

> Duty not to compete with Filter Resources by establishing his own new, competing business, while still employed at Filter Resources;

> Duty not to misuse Filter Resources' materials and resources to establish his own new, competing business, while still employed at Filter Resources[;]

> Duty to refrain from using Filter Resources' confidential and proprietary information, disclosed during employment with Filter Resources[.]

Although Rhymes was entitled to begin planning to compete with Filter during his employment, at the very least, the jury could reasonably conclude that Rhymes breached his fiduciary duty by engaging in a course of conduct designed to harm Filter, such as misusing Filter's resources to contact and obtain Filter's customers.[2] *See Johnson*, 73 S.W.3d at 201-02. Accordingly, we conclude that the

---

[2]With regard to breach of the duty to refrain from using Filter's confidential and proprietary information, Rhymes argues that "Question 2 [regarding breach of non-disclosure provisions] submits a breach of contract theory based on the contractual provisions in the Employment Contract which prohibit ownership in a

evidence is legally sufficient to support the jury's findings. We overrule issues one, two, and three.

In issue four, Rhymes maintains that the evidence is legally insufficient to support the jury's finding that he and Industrial tortiously interfered with Filter's prospective contractual or business relations. To prevail on a claim for tortious interference, a plaintiff must prove the following:

> (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). According to Rhymes, Filter failed to demonstrate an independent tort that proximately caused actual damage to Filter.

The intentional breach of a fiduciary duty is a tort. *Brosseau v. Ranzau*, 81 S.W.3d 381, 396 (Tex. App.—Beaumont 2002, pet. denied). As previously discussed, the evidence is legally sufficient to support the jury's breach of

competing corporation and disclosure of Filter Resources' confidential and proprietary information, the identical fiduciary duties submitted in Question 3 under a tort theory." According to Rhymes, "[t]he contractual provisions foreclose any tort liability for breach of fiduciary duty." However, as previously noted, the charge asked the jury whether Rhymes violated *any* of three fiduciary duties.

12

fiduciary duty finding. When "a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942). According to Rhymes, the jury charge does not include a separate question regarding knowing participation. The jury was asked if "Rhymes and/or Rhymes Industrial intentionally interfere[d] with Filter Resources' prospective contractual or business relations[.]" The trial court instructed the jury that tortious interference occurs, in part, when the party "acted with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct[.]"

To find that Industrial knowingly participated in Rhymes's breach, the jury would have to find that (1) Industrial knew that Rhymes owed a duty to Filter and (2) Industrial was aware of its participation in the breach. *See DeYoung v. Beirne, Maynard & Parsons, L.L.P.*, No. 01-13-00365-CV, 2014 Tex. App. LEXIS 2965, at *15 (Tex. App.—Houston [1st Dist.] Mar. 18, 2014, no pet.) (mem. op.). Such findings are subsumed within the jury's conclusion that Industrial knew that interference with Filter's relationships was certain or substantially certain to occur as a result of Rhymes's conduct. The

13

trial court was not required to submit a separate question on knowing participation. *See* Tex. R. Civ. P. 277 ("In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions."); *see also Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 665-66 (Tex. 1999) ("While trial courts should obtain fact findings on all theories pleaded and supported by evidence, a trial court is not required to, and should not, confuse the jury by submitting differently worded questions that call for the same factual finding.").

Rhymes also contends that knowing participation cannot support tortious interference by Industrial because it is a derivative tort rather than an independent tort. "Independently tortious" does not mean that the plaintiff must prove an independent tort; rather, it means that the "defendant's conduct would be actionable under a recognized tort." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001). The jury heard evidence that Industrial relied on Rhymes's knowledge, sales, and solicitation of business. Cheryl testified that Industrial was formed with the knowledge that, if Rhymes solicited Filter's customers, he would be violating his employment contract. The record also indicates that Industrial knew that its customers were all previous customers of Filter. The record contains evidence supporting a conclusion that Industrial's conduct would be actionable under a recognizable tort, which is all Filter was

14

required to show. *See id*. The jury could reasonably conclude that Industrial knew of the fiduciary duties Rhymes owed to Filter and knew that it was participating in Rhymes's breach of those duties. *See Coinmach Corp.*, 417 S.W.3d at 923; *see also Kinzbach Tool Co.*, 160 S.W.2d at 514.

"The classic proximate-cause tests for cause-in-fact and foreseeability apply to claims of tortious interference." *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). "Establishing causation requires that the plaintiff bring forth sufficient facts so that the evidence, and logical inferences drawn from the evidence, support a reasonable probability that the defendant's acts or omissions were a substantial factor in bringing about injury." *Id*. The record contains evidence demonstrating that, after Rhymes's departure, Jonell's sales to Filter began declining, Filter's sales substantially decreased, Filter's lost sales could not all be recouped, Filter lost several customers to Rhymes and Industrial, and Rhymes interfered with an existing consignment agreement. The jury was entitled to conclude that Filter presented sufficient facts to support a reasonable probability that Rhymes's conduct was a substantial factor in bringing about actual damage to Filter. *See id*. We overrule issue four.

In issue five, Rhymes contends that Filter failed to show damages proximately caused by breach of the non-solicitation clause, breach of the non-disclosure and confidentiality provisions, breach of fiduciary duty, and tortious interference. "Proximate cause comprises two elements: cause in fact and foreseeability." *Smith*, 307 S.W.3d at 774. The test for causation in fact is "whether the defendant's act or omission was a substantial factor in causing the injury and without which the injury would not have occurred." *Id.* "Foreseeability requires only 'that the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.'" *Ryder Integrated Logistics, Inc. v. Fayette Cty.*, 453 S.W.3d 922, 929 (Tex. 2015) (quoting *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 551 (Tex. 1985)).

Again, the record contains evidence demonstrating that Rhymes's breaches and tortious interference led to the loss of customers and, consequently, the loss of substantial profits that otherwise would have gone to Filter. As previously discussed, the jury heard evidence by which it could reasonably conclude that Rhymes's conduct was a substantial factor in causing harm to Filter. *See Smith*, 307 S.W.3d at 774. The jury could also reasonably conclude that Filter's

16

injury, the loss of customers and profits, would not have occurred absent Rhymes's conduct. *See id*. That Filter would lose customers and sales is an injury that Rhymes should reasonably have anticipated would result from his conduct. *See Ryder Integrated Logistics, Inc.*, 453 S.W.3d at 929. We overrule issue five.

In issue six, Rhymes argues that the evidence is legally insufficient to support the jury's damage award. In our opinion of April 14, 2016, which we have withdrawn, we affirmed the jury's award of lost profits of $620,000 to Filter. In his motion for rehearing, Rhymes argues that it was error for this Court to affirm the lost profits damage award of $620,000, because it was based on evidence of Industrial's gross revenues for the one-year period covered by the non-compete agreement. According to Rhymes, under Texas law, the calculation of lost profits must be based on net profits, not gross revenues or gross sales. While Rhymes argues that there is no legally sufficient evidence to support the jury's lost profits award of $620,000, he claims that the evidence is sufficient to support an award of $206,767 in lost profits. Rhymes asks that we suggest a remittitur of $206,767.

The rule determining whether there is adequate evidence of lost profits is well established:

> Recovery for lost profits does not require that the loss be susceptible of exact calculation. However, the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

*Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992) (citations omitted). The jury awarded Filter $620,000 in lost profits for the one-year non-solicitation period. In our legal sufficiency analysis, we review whether competent evidence establishes this amount with reasonable certainly. *See id.* Additionally, in light of Rhymes's contention that there is legally sufficient evidence to support an award of $206,767 in lost profits, we will also review whether competent evidence exists to support a lesser award.

"Lost profits are damages for the loss of net income to a business measured by reasonable certainty." *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002). The calculation of lost profits must be based on net profits. *Holt Atherton*, 835 S.W.2d at 83 n.1. Although there is more than one correct method for calculating lost profits, once a party has chosen a particular method, recovery of lost profits must be predicated on one complete calculation. *Springs Window Fashions Div., Inc. v.*

18

*Blind Maker, Inc.*, 184 S.W.3d 840, 884 (Tex. App.—Austin 2006, pet. granted, judgm't vacated w.r.m.) (op. on reh'g). "The plaintiff bears the burden of providing evidence supporting a single complete calculation of lost profits, which may often require certain credits and expenses." *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 878 (Tex. 2010).

The jury heard Compton, Filter's lost profits expert, testify that in his opinion, Filter incurred $622,800 in lost profits over a five-year period due to Rhymes selling to Filter's customers during the one-year non-solicitation period. Compton explained to the jury how he calculated Filter's lost profits over a five-year period. Compton testified that he compared Rhymes's and Filter's financial and sales information and prepared a report showing Filter's estimated lost profits ranging from $234,000 during the first year to almost $623,000 over a five-year period. Compton testified that he based his lost profits calculations on the profits that Rhymes made by selling to Filter's customers during the non-solicitation period.

Compton testified that Rhymes's actual sales to Filter's customers during the non-solicitation period was $638,746. Compton further testified that he deducted $403,959 in expenses, which was the cost of the goods Rhymes sold to Filter's customers, from Rhymes's actual sales and concluded that Rhymes made

19

a profit of $234,787 over a one-year period. Compton explained that he used Rhymes's profit of $234,787 from that first year as Filter's lost profits. Compton then made a deduction on Filter's side, subtracting $28,020 in avoided salary costs, for the amount that Filter saved during that first year by not immediately replacing Rhymes. According to Compton's calculations, Filter incurred $206,767 in lost profits during the first year. Compton further explained how he used Filter's lost profits for the first year to calculate that Filter incurred $622,800 in lost profits over a five-year period.

The jury also heard testimony from Bridges, Filter's vice-president, who was familiar with Filter's financial and sales history. Bridges testified that Rhymes ranged from $638,745 to $732,914 in total sales income the first year that Rhymes was set up as Industrial, and that all of Rhymes's sales came from Filter's clients. Bridges testified that these profits would have remained with Filter but for Rhymes's actions and would have been pure profit for Filter. The jury awarded Filter $620,000 in lost profits for the one-year non-solicitation period ranging from August 18, 2012, to August 17, 2013.

In reviewing whether legally sufficient evidence exits to support the jury's award of $620,000 in lost profits for the non-solicitation period, we must determine whether competent evidence establishes this amount with reasonable

certainty. *See Holt Atherton*, 835 S.W.2d at 84. Filter had the burden of providing evidence supporting a single complete calculation of lost profits, including any required credits and expenses. *See Swinnea*, 318 S.W.3d at 878. Neither Compton's nor Bridges's testimony concerning the amount of Rhymes's actual sales during the first year provided a single complete calculation of lost profits. *See id.* Compton testified that Rhymes's actual sales to Filter's customers during the non-solicitation period was $638,746, and Bridges testified that Rhymes's total sales income the first year ranged from $638,745 to $732,914. Testimony concerning Rhymes's total sales income provided evidence of lost sales to Filter, and lost sales are not the same thing as lost profits. *See Holt Atherton*, 835 S.W.2d at 84 ("[L]ost income is not the correct measure of damages."); *Kellmann v. Workstation Integrations, Inc.*, 332 S.W.3d 679, 685 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (holding that evidence of gross revenue, rather than net revenue, did not establish lost profits).

Lost profits are for the loss of net income, and the calculation of lost profit damages must be based on net profits. *Miga*, 96 S.W.3d at 213; *Holt Atherton*, 835 S.W.2d at 83 n.1. Because lost profit damages must be based on net profits, Compton's and Bridges's testimony regarding the amount of Rhymes's total sales during the first year fails to provide competent evidence supporting a single

21

complete calculation of lost profits. *See Swinnea*, 318 S.W.3d at 878. We conclude the evidence was legally insufficient to support the jury's award of $620,000 in lost profits during the non-solicitation period. We sustain Rhymes's sixth issue.

However, this insufficiency does not extend to a reasonable certainty as to any amount of lost profit damages. *See id.* at 880. Filter suggests, and we agree, that competent evidence exists to support a lesser award of lost profits. Because Filter proved lost profit damages in some amount, its entitlement to recover them survives the jury awarding an excessive amount. *See id.* at 878. "If part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict." *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987); *see also* Tex. R. App. P. 46.3. Because the evidence in this case justifies some award of lost profit damages, but is insufficient to support the jury's $620,000 award, we must determine the maximum amount the jury could reasonably award based on the record before us.

In determining the maximum amount the jury could have awarded, we consider Rhymes's contention that $206,767 is the highest amount of lost profit damages supported by the evidence. Our review of the record shows that competent evidence exists to establish with reasonable certainty that Filter

incurred lost profit damages of $206,767. *See Holt Atherton*, 835 S.W.2d at 84. Compton testified that Filter incurred $206,767 in lost profits during the first year, and he explained that he calculated his estimate by using Rhymes's total sales during the first year as Filter's lost profits and then deducting the cost of goods and avoided salary costs. Because Compton's calculation of $206,767 in lost profit damages is based on net profits, we hold that Compton's testimony provides competent evidence supporting a single complete calculation of lost profits. *See id.* at 83 n.1.

We conclude that there is sufficient evidence to support that Filter incurred $206,767 in lost profit damages during the one-year non-solicitation period. Accordingly, we suggest a remittitur of $206,767. The party prevailing in the trial court must be given the option of accepting the remittitur or having the case remanded for a new trial. *See Larson*, 730 S.W.2d at 641. If the sum is not remitted, the judgment will be reversed, and the cause will be remanded to the trial court for a new trial.

In its first cross-issue, Filter asks that, in the event we disagree with Filter's arguments supporting the jury's damage award for the one-year non-solicitation period, we set aside the award and apportion the $620,000 across periods of time where the jury awarded $0 in damages. The trial court's charge

23

instructed the jury to consider awarding lost profit damages over three periods of time. The jury awarded $620,000 in damages for the first period of August 18, 2012, to August 17, 2013, which covered the one-year non-solicitation period. The jury awarded $0 in damages for the second period ranging from August 18, 2013, to the date of trial, and the third period beginning on the date of trial and ending August 17, 2017.

Filter contends that the jury's findings of zero damages for two of the periods is not supported by legally sufficient evidence. Filter argues that the jury could not disregard Compton's opinion that Filter's damages over a five-year period would be approximately $620,000, because Compton's testimony was uncontroverted and established as a matter of law. According to Filter, because Compton's testimony exclusively established that Filter would incur damages of $620,000, this Court should render judgment awarding Filter damages for all three periods, totaling $620,000. Rhymes argues that Texas law does not allow appellate courts to reapportion damage awards in this manner. *See Cressman Tubular Prods. Corp. v. Kurt Wiseman Oil & Gas, Ltd.*, 322 S.W.3d 453, 462-63 & n.7 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). According to Rhymes, the fact that the jury's award of $620,000 for the one-year non-solicitation period is excessive and unsupported by the evidence does not

24

authorize this Court to allocate damages to periods where the jury awarded zero damages.

"[T]he judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone, where the jury or court cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). An expert's opinion testimony does not establish any material fact as a matter of law. *Id.* The jury is afforded considerable discretion in evaluating opinion testimony on the issue of damages and is entitled to disbelieve or discount any part of an expert's testimony. *Id.*; *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 50 (Tex. App.—San Antonio 2006, no pet.).

Although Compton testified that he used standard methodology for calculating Filter's lost profits over a five-year period, the assumption he used to determine the extent of Filter's future lost profits was speculative. *See AZZ Inc. v. Morgan,* 462 S.W.3d 284, 298 (Tex. App.—Fort Worth 2015, no pet.). Compton testified that he based his opinion that Filter would incur lost profit damages over a five-year period on the assumption that Filter's losses were indefinite, meaning

25

that there was no time limit on the damages. Compton agreed that the issue of whether Filter had been damaged indefinitely was a question for the jury to decide.

Compton explained that it is harder to calculate the plaintiff's damages over a longer time period because it becomes too difficult to connect future lost profits with the defendant's actions and because other things happen that mitigate damages. To account for uncertainty and mitigation, Compton explained that he reduced his estimates of lost profits by twenty percent each year over the five-year period. Compton further explained that he accounted for the uncertainty of the longer time period by discounting the future losses by twelve percent each year.

Because the jury has considerable discretion in evaluating expert testimony, the jury could choose to not believe Compton's assumption that Filter was damaged indefinitely, and thus disregard Compton's opinion that Filter would incur lost profits over a five-year period. *See McGalliard*, 722 S.W.2d at 697; *Vela*, 203 S.W.3d at 50. We conclude that the jury could have reasonably determined that the assumption was incorrect, that Compton's opinion concerning Filter's future lost profits was speculative, and that an award of future lost profit damages based on the assumption was not justified. We further

conclude that Compton's testimony was only opinion evidence and did not conclusively establish as a matter of law that Filter would incur future lost profits during the time periods where the jury awarded $0 in damages. *See McGalliard*, 722 S.W.2d at 697; *see also Senegal v. Payne*, No. 09-13-00508-CV, 2015 WL 4053504 at *4-5 (Tex. App.—Beaumont July 2, 2015, no pet.) (mem. op.). We overrule Filter's first cross-issue.

Evidentiary Challenge

In issue seven, appellants argue that any evidence of damages sustained after the contract's one-year non-solicitation period was improperly admitted because it was speculative. "We review a trial court's evidentiary rulings for abuse of discretion." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000).We will not reverse unless the error probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1).

In his expert report, Compton provides three periods of lost profits. "Case 3" estimated lost profits assuming Filter suffered indefinite damage. Rhymes moved to exclude Case 3 on grounds that the one-year non-solicitation clause covers the period from August 18, 2012, to August 17, 2013, but Case 3 attempts to recover $622,845 for the five-year period from August 18, 2012, to August 17, 2017. Rhymes argued that Case 3 was "irrelevant, unreliable,

27

speculative and contrary to the terms of the Employment Contract." The trial court overruled Rhymes's objection to the admission of Compton's testimony regarding Case 3, stating that Compton's "analysis [is] based on an assumption that may or may not be correct, that's a fact of the matter in dispute between the parties [that] would go to the weight[,] not the admissibility." On appeal, without citation to record references, Rhymes argues that:

> The lost sales that comprise the future damages sought by Filter Resources for the 4 years after the expiration of the non-solicitation covenant are attributable to customers who had no contractual agreements with Filter Resources and who were free to stop sending business to Filter Resources at any time for any reason. This renders the damages sought by Filter Resources for the four years after the expiration of the non-solicitation covenant speculative and no evidence as a matter of law.

The trial court has discretion to determine the admissibility of expert testimony. *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). The trial court's ultimate task is to determine whether the expert's analysis is reliable, not to determine whether the expert's conclusions are correct. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 239 (Tex. 2010). Any question about the reasonableness of Compton's methodology or the factual basis of his testimony goes to its weight and not its admissibility. *See Pena v. Ludwig*, 766 S.W.2d 298, 304 (Tex. App.—Waco 1989, no writ).

28

At trial, Compton explained that he reviewed Rhymes's and Filter's financial information and actual sales, lawsuit documents, and depositions. He testified that there are Texas guidelines that he must follow when formulating a calculation and that he followed these guidelines. Compton testified that he assumed that Rhymes's leaving Filter caused the loss of business and that Filter was damaged indefinitely by Rhymes's actions, which he defined as a five-year period. He described in detail the formula he used to determine Filter's lost profits. On cross-examination, Rhymes challenged Compton's assumption that Filter suffered indefinite damage and the calculations based on that assumption. We conclude that Rhymes's complaint about Compton's testimony went to its weight and not its admissibility. Accordingly, the trial court did not abuse its discretion by admitting the complained-of evidence. Moreover, even if the trial court had erred in admitting the evidence, it did not result in an improper judgment, because the jury only awarded damages for the one-year non-solicitation period. *See* Tex. R. App. P. 44.1(a)(1). We overrule issue seven.

## Injunctive Relief

In issue eight, Rhymes contends that there is no basis for the trial court's award of injunctive relief. In its final judgment, the trial court conditionally granted Filter's request for injunctive relief requiring Rhymes to return his cell

29

phone and SIM card should Rhymes fail to do so voluntarily. The trial court denied Filter's request for additional injunctive relief. On appeal, Rhymes maintains that the cell phone and SIM card are his personal property, Filter did not submit the issue of ownership to the jury, and without a jury finding on the issue, Filter has waived a right to relief.

"The jury does not determine the expediency, necessity, or propriety of equitable relief." *State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979). "The determination of whether to grant an injunction based upon the ultimate issues of fact found by the jury is for the trial court, exercising chancery powers, and not the jury." *Id.* "Injunctive relief is recognized as a proper remedy to protect confidential information and trade secrets." *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ.). "An injunction is appropriate when necessary to prohibit an employee from using confidential information to solicit his former employer's clients." *Id.*

The record indicates that Rhymes brought a particular cell phone number along with him when he began working for Filter. Filter proceeded to purchase a new cell phone, using this same number, for Rhymes and Filter paid at least a portion of Rhymes's cell phone bill during his employment. After leaving Filter, Rhymes took the cell phone, which contained information regarding Filter's

customers, and used that cell phone to solicit Filter's customers. The jury found that Rhymes breached his employment contract with Filter, breached his fiduciary duties, and tortiously interfered with Filter's prospective business relations; thus, the trial court was entitled to conclude that Rhymes had engaged in a settled course of conduct and to assume that such conduct would continue. *See Tex. Pet Foods, Inc.*, 591 S.W.2d at 803-04. In so doing, the trial court could reasonably conclude that an injunction requiring Rhymes to return the cell phone and SIM card was necessary to prevent Rhymes from continuing to use Filter's confidential information to solicit Filter's customers. *See id*. at 803; *see also Rugen*, 864 S.W.2d at 551. We overrule issue eight.

## Attorney's Fees

In its second cross-issue, Filter argues that the trial court abused its discretion by finding that Filter was not entitled to attorney's fees as awarded by the jury. The jury awarded Filter $125,000 in attorney's fees for representation in the trial court based on its conclusion that Rhymes breached the non-solicitation clause. Rhymes filed a motion for judgment notwithstanding the verdict, in which he contended that the Texas Covenants Not to Compete Act (the "Act") prohibited an award of attorney's fees. The trial court granted Rhymes's motion on this issue. On appeal, Filter argues that it is entitled to

31

attorney's fees under section 38.001(8) of the Civil Practice and Remedies Code because: (1) the jury found that Rhymes breached the contract's non-disclosure provision; and (2) the trial court awarded injunctive relief.[3]

In response, Rhymes argues that Filter's request for attorney's fees under section 38.001 is barred by a lack of presentment. "A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 2015). To recover such fees, "the claimant must present the claims to the opposing party or to a duly authorized agent of the opposing party[]" and "payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented." *Id.* § 38.002(2), (3). Presentment is "required to allow the person against whom the claim is asserted an opportunity to pay the claim within thirty days of receiving notice of the claim, thereby avoiding the obligation to pay

_____

[3]Rhymes contends that Filter has waived its complaint with regard to breach of the non-disclosure provision. According to the record, in response to Rhymes's motion for judgment notwithstanding the verdict, Filter argued that Rhymes's argument ignored the fact that Filter requested injunctive relief. On appeal, Filter maintains that attorney's fees are authorized by section 38.001(8) because Filter received something of value in the form of injunctive relief because of Rhymes's breach of contract. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 2015). Accordingly, we conclude that Filter's complaint is preserved for appellate review.

attorney's fees." *Note Inv. Grp., Inc. v. Assocs. First Capital Corp.*, 476 S.W.3d 463, 485 (Tex. App.—Beaumont 2015, no pet.). "All that is necessary is that the party seeking attorney's fees show that it made an assertion of a debt or claim and a request for compliance to the opposing party, and that the opposing party refused to pay the claim." *Id*. Although a particular form of presentment is not required, "neither the filing of suit, nor the allegation of a demand in the pleadings can, alone, constitute presentment of a claim or a demand that a claim be paid." *Id*.

Filter maintains that it satisfied the presentment requirement because: (1) during his deposition, Rhymes "was confronted with evidence of his breach of the Employment Contract[]" and denied any breach, "thereby indicating his intention to continue operating his competing business[;]" (2) during mediation, Filter informed Rhymes's counsel that "Filter considered Rhymes to be in breach of the Employment Contract and demand[ed] that he stop[;]" and (3) "Filter made several demands far in advance of trial in this case, and it is undisputed that [Rhymes] did not respond or make any tender of payment within 30 days of any of the demands." Filter does not cite this Court to any record references to substantiate its contention regarding mediation or any other demands made before trial. *See Genender v. USA Store Fixtures, LLC*, 451 S.W.3d 916, 927

(Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Evidence that the parties participated in settlement negotiations, without more, is no evidence of presentment."); *see also* Tex. R. App. P. 38.1(g), 38.2(a)(1). Moreover, "presentment" refers to a request or demand for payment or performance. *Note Inv. Grp., Inc.*, 476 S.W.3d at 485. Filter does not direct this Court to any request or demand for payment or performance arising out of the breach. *See id*.; *see also King v. Wells Fargo Bank, N.A.,* 205 S.W.3d 731, 734-35 (Tex. App.—Dallas 2006, no pet.) (It is the party's burden to direct the appellate court to evidence in the record that supports the party's contention; it is not an appellate court's duty to conduct an independent search of the record for evidence to support a party's position.). Robert Alan Black, Filter's attorney's fees expert, testified that he had not seen any presentment "one way or the other." Our review of the record has not revealed any evidence of presentment upon which the trial court could enforce the jury's attorney's fee award under section 38.001. We overrule Filter's second cross-issue.

## Conclusion

In conclusion, we affirm the judgment of the trial court conditioned on Filter remitting the jury's damage award for the one-year non-solicitation period in the sum of $206,767. If Filter accepts the remittitur that we have suggested

within fifteen days of the date of this opinion, we will affirm the trial court's judgment, as reformed. *See* Tex. R. App. P. 46.3, 46.5. If Filter fails to timely file the suggested remittitur, we will reverse the trial court's judgment and remand the cause to the trial court for a new trial. *See Larson*, 730 S.W.2d at 641.

AFFIRMED CONDITIONALLY.

_____
STEVE McKEITHEN
Chief Justice

Submitted on May 19, 2016
Opinion Delivered September 22, 2016

Before McKeithen, C.J., Horton and Johnson, JJ.

Concurring Opinion

I concur in the result the majority reaches, which is to affirm the trial court's judgment conditioned on a significant remittitur of the damages the jury awarded in its verdict to Filter. However, I cannot agree with the analysis the majority employs to resolve issue seven, wherein the court holds that the trial court properly admitted the entirety of the testimony of Filter's damages expert, Jeffrey Compton. Therefore, I do not join that portion of the Court's opinion.

According to the majority, the entirety of Compton's testimony was properly admitted into evidence because: "Any question about the reasonableness of Compton's methodology or the factual basis of his testimony goes to its weight and not its admissibility." Nevertheless, the majority's discussion of issue six outlines a significant reliability problem with a large part of Compton's testimony, as the Court determined that Compton's damages testimony was legally insufficient to support the jury's award of $620,000 in damages. I agree with the Court's resolution of issue six, as I fully agree that Compton's testimony was unreliable and cannot support an award of $620,000 in damages.

Nonetheless, the Court then explains why Compton's testimony would have supported an award of $206,767, an amount that represents Filter's damages during the one-year period following the date that Rhymes left his job with Filter.

1

According to the majority, damages of that amount are supported by reliable evidence because Compton's damage calculation for that period did not suffer from the flaw that existed in his opinion calculating Filter's damages in the amount of $620,000. According to the Court, Compton's calculation of the damages Filter suffered in the first year that Rhymes left his job with Filter was reliable because he based that calculation on a single complete calculation of lost profits, as is required by Texas law.

In summary, the majority reasons that Compton's testimony was legally competent to support the jury's damage award for the first year that Rhymes left his job with Filter, but incompetent evidence with respect to supporting additional damages in other years. In issue seven, however, having declared Compton's testimony largely unreliable, the majority states that the trial court did not err in admitting Compton's testimony despite the Court's extensive explanation about why it was largely unreliable and misleading regarding Filter's damages. According to the majority, the methodology Compton utilized to arrive at his estimate is a matter that concerns solely the weight the jury should have given Compton's testimony. I disagree, as the flaw made Compton's $620,000 estimate unreliable and misleading, and in this case caused the jury to return a verdict that was based on legally insufficient evidence. Because the flaw in Compton's

2

$620,000 damage estimate affected the reliability of that estimate, the trial court erred by admitting the testimony and effectively delegating the court's responsibility as gatekeeper of expert testimony to place that responsibility on the jury. In my opinion, it is the trial court's responsibility to ensure that the jury heard only reliable testimony on the issue of Filter's damages. And, to the extent Compton's testimony was unreliable, that portion of his testimony should not have been admitted. *See E.I. du Pont de Nemours and Company v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).

To support the proposition that the entirety of Compton's testimony was properly before the jury, the majority relies on *Pena v. Ludwig*, 766 S.W.2d 298 (Tex. App.—Waco 1989, no writ), a case decided well before the Texas Supreme Court decided *Robinson*. In *Robinson*, the Court explained that the trial court was responsible for limiting expert testimony so that the jury heard reliable evidence, indicating "[t]he trial court is responsible for making the preliminary determination of whether the proffered testimony meets the standards set forth today." 923 S.W.2d at 556. Compton's testimony was required to meet the reliability standards identified in *Robinson*, and *Pena* does not support the proposition that legally insufficient evidence of a party's damages is admissible. I would hold the trial court erred by admitting Compton's testimony that Filter's damages were $620,000

because that part of his damages testimony was unreliable.

Nonetheless, if Filter accepts the remittitur that the Court has suggested, the trial court's error in admitting that part of Compton's damages testimony that was unreliable will not have resulted in an improper judgment. The Court has remitted the damages to an amount that is supported by sufficiently reliable evidence, so the judgment the Court has proposed will not include any damages that are based on the unreliable portions of Compton's testimony. Therefore, I concur with the amount of the suggested remittitur, and with the decision to award Rhymes and Rhymes Industrial Filtration & Consulting L.L.C. a new trial if Filter refuses to accept the judgment the Court proposes.

$\overline{\hspace{4cm}}$
HOLLIS HORTON
Justice

Concurrence Delivered
September 22, 2016

4